HUDSON DISTRIBUTORS, INC., APPELLEE, *v.* THE UPJOHN CO., APPELLANT.*
HUDSON DISTRIBUTORS, INC., APPELLEE, *v.* ELI LILLY & CO., APPELLANT.*

(Nos. 25371 and 25374—Decided July 13, 1961.)

*Messrs. Mendelsohn, Krotinger, Lane, Santora & Shaw*, for appellee.

*Messrs. Thompson, Hine & Flory, Messrs. Vorys, Sater, Seymour & Pease, Mr. George M. Chapman, Mr. Robert H. Hosick* and *Mr. Murray D. Welch, Jr.*, for appellant in case No. 25371.

*Messrs. Henderson, Quail, Schneider & Peirce* and *Mr. James I. Huston*, for appellant in case No. 25374.

SKEEL, J. These appeals come to this court on questions of law from judgments entered for the plaintiffs, appellees herein, in the Court of Common Pleas of Cuyahoga County. The actions seek a declaratory judgment declaring the Ohio Fair Trade Act invalid and unconstitutional. Both cases involve similar facts and, with the questions to be determined by this court the same in each case, the appeals will be considered together. The assignment of error is identical in both cases.

"For its assignment of error, the defendant-appellant asserts that the Court of Common Pleas of Cuyahoga County erred in declaring Sections 1333.27 through 1333.34 of the Ohio

*Judgment affirmed, 174 Ohio St., 487, for the reason that fewer than six members of the Supreme Court were of the opinion that the Ohio Fair Trade Act was unconstitutional. Section 2, Article IV, Constitution.

Revised Code to be in violation of the Constitution of the state of Ohio, and therefore void and not binding upon the plaintiff-appellee, and in granting judgment for the plaintiff-appellee on its petition and dismissing the cross-petition of the defendant-appellant.''

The plaintiff, in both cases, is the operator of retail stores selling, among other things, pharmaceutical products. The defendant, in each case, is the manufacturer of pharmaceutical items which are distributed to retailers either directly or through wholesalers or jobbers. They do not sell at the retail level. The products manufactured by these defendants for ultimate use and consumption of retail buyers are manufactured and identified under a trademark, trade or brand name, and sold at retail in free and open competition with commodities of the same general class.

These defendants or their distributors have entered into many written contracts with retail pharmaceutical establishments in Ohio, determining the retail resale price for their trademarked or branded commodities and have caused notice of these contracts and the prices therein established to be served on the plaintiff. The defendants, therefore, claim the protection of the Ohio Fair Trade Act. It is alleged in defendants' cross-petitions that the plaintiff, purchasing the defendants' trademarked or trade name or branded products in interstate commerce, with notice of the established retail resale price in Ohio, is continuing to sell such articles (purchased by them after such notice) at retail at cut-rate prices, below the retail price fixed by the defendants, in total disregard of the Fair Trade Act. It is the contention of the plaintiff, among other claims, that the Ohio Fair Trade Act, passed effective October 22, 1959, constitutes a delegation of legislative power to private persons and for that reason is unconstitutional.

The historical background of the Ohio Fair Trade Act began in 1936 upon the passage of what are now known as Sections 1333.05 to 1333.10, inclusive, of the Revised Code. This legislation followed after the Congress and the Supreme Court of the United States, by successive acts and decisions, dealt with the right of a manufacturer who identified his products by a trade name or trademark to assure the ultimate consumer that such product was manufactured by him, to protect his

"goodwill," created by producing quality merchandise as advertised, from the alleged claims of injury to such "goodwill" by price-cutting retailers. There can be no doubt that the buying public is benefited under modern merchandising methods to be able to identify goods either desired or to be avoided by trade name or trademark. This court can take notice of the complete change in merchandising methods over the past seventy-five years. From cracker barrel days when manufacturers found their markets in the locality of their business or sales were made to the ultimate consumer through the retailer's reputation, the retailer in turn being the object of the sales activity of manufacturers or wholesalers, to the present period when the manufacturer points his sales activities to attract the attention of the consuming public and the retailer prepares his stock to meet the demands of the buying public as influenced by the direct advertising of the maufacturer, it must follow that the manufacturer's goodwill is an important and valuable factor in the retail market of today. The manufacturer or wholesale distributor, in seeking to attract the public to buy his products, uses his distinctive trademark or trade name by which his goods are identified. So completely have the processes of merchandising consumer goods changed that the Supreme Court of Ohio held in the case of *Rogers* v. *Toni Home Permanent Co.* (1958), 167 Ohio St., 244, that an action claiming a breach of an express warranty could be maintained against the manufacturer without privity of contract, that is where the goods were purchased by the consumer from an independent retailer, the buyer (consumer) being induced to buy the manufacturer's product through the manufacturer's direct advertising and consumer sales efforts. On page 248, the court said:

"Occasions may arise when it is fitting and wholesome to discard legal concepts of the past to meet new conditions and practices of our changing and progressing civilization. Today, many manufacturers of merchandise, including the defendant herein, make extensive use of newspapers, periodicals, signboards, radio and television to advertise their products. The worth, quality and benefits of these products are described in glowing terms and in considerable detail, and the appeal is almost universally directed to the ultimate consumer. Many of these manufactured articles are shipped out in sealed con-

tainers by the manufacturer, and the retailers who dispense them to the ultimate consumers are but conduits or outlets through which the manufacturer distributes his goods. The consuming public ordinarily relies exclusively on the representations of the manufacturer in his advertisements. What sensible or sound reason then exists as to why, when the goods purchased by the ultimate consumer on the strength of the advertisements aimed squarely at him do not possess their described qualities and goodness and cause him harm, he should not be permitted to move against the manufacturer to recoup his loss. In our minds no good or valid reason exists for denying him that right. Surely under modern merchandising practices the manufacturer owes a very real obligation toward those who consume or use his products. The warranties made by the manufacturer in his advertisements and by the labels on his products are inducements to the ultimate consumers, and the manufacturer ought to be held to strict accountability to any consumer who buys the product in reliance on such representations and later suffers injury because the product proves to be defective or deleterious. See Prosser on Torts (2 Ed.), 506, Section 84; 1 Williston on Sales (Rev. Ed.), 648 to 650, Section 244a.''

The liability of the manufacturer would be the same even though his goods were purchased from a price-cutter to his claimed detriment. It would be unusual that modern trends in retail merchandising should thus create a direct liability against a manufacturer for breach of warranty in the representations inducing the sale of his goods made by the manufacturer, the sale being made by an independent retailer, and then to refuse such manufacturer the right to protect his property right in his goodwill, the representations which created the inducing cause of the sale, from damages to such property right by the acts of the retailer selling his goods at cut-rate price in violation of the fair-trade price set on the basis of a contract under the Fair Trade Act.

It is the claim of those supporting ''Fair Trade'' legislation that the goodwill of the manufacturer created by his direct sales efforts, and in maintaing goodwill by the quality of his products, whereby the consuming public seeks out his goods without any sales effort on the part of the retailer whose only

part in the transaction is to have the goods available for sale at the selection of the consumer purchaser, is damaged and his product depreciated by retail price-cutting practices.

In an attempt to protect the value of a manufacturer's goodwill, established by his sales efforts (in support of the quality of his product) in relation to his trademarked goods, from the claimed detriment of price-cutting retailers, both the Legislatures of the several states and the Congress of the United States, beginning at about the turn of the century, have been attempting to provide regulations to protect the manufacturer's property right in his goodwill. from detriment due to the uncontrolled action of price-cutting retailers. The basis of these efforts has been to provide by law the conduct between the manufacturer and the retailer acquiring the goods for resale that will create contractual relations between them by which a minimum retail sales price can be established.

The cases on contracts between manufacturer and retailers, whereby the retailer agrees to maintain a retail price set by the owner of trademarked or trade-named goods by which the manufacturer's goods are identified and who, over the years, has, by expending time and capital, developed what is called "goodwill" in relation to his product, these contracts being identified and characterized as supporting "fair trade," have been upheld as between the parties at common law. .

However, after the passage of the "Sherman Act" by the Congress of the United States in 1890, the Supreme Court of the United States in *Dr. Miles Medical Co.* v. *John D. Parks & Sons Co.*, 220 U. S., 373, 55 L. Ed., 502, 31 S. Ct., 376, held that a contract controlling the resale price between a manufacturer and a retail dealer with regard to goods in interstate commerce constituted a violation of the Sherman Act. The results of this case for a time ended legislative attempts to provide against unfair trade practices alleged to result from price cutting.

A reading of the opinion of Mr. Justice Hughes in the *Dr. Miles Medical Co. case,* which was decided in 1911, makes it clear that the only question decided dealt with contracts in restraint of trade in interstate commerce under the Sherman Act. The Dr. Miles Medical Company, the manufacturer of a non-patented, secret formula remedy, attempted to control the price

of its products, both at retail and wholesale, by two forms of restrictive agreements limiting trade in the products of Dr. Miles to those who became parties to either of such contracts. One contract was a consignment entered into with wholesalers, the other was a retail agency contract made with retail dealers throughout the United States. The defendant was a wholesale drug concern that refused to enter into the required contract but procured Dr. Miles' products for sale at cut-rate prices by inducing those having contractual relations with Dr. Miles to breach their contracts. One question presented was the validity of the consignment contract between Dr. Miles and certain jobbers. This question was not clearly considered because the allegations of the complaint as to the manner in which defendant procured the goods were not set out. The complainant relied on two claims, the first being that its product was an article created under a secret process of which the manufacturer was the owner. This claim was held without legal foundation to protect a contract controlling retail prices, under the Sherman Act. The court said that the question concerns not the process of manufacture but rather an article in commerce. The complainant, the court said, could not rely on the protection afforded a patentee derived by a statutory grant. The second claim was that the complainant was entitled to maintain the restrictions by virtue of the fact that the restrictions related to products of its own manufacture. Ordinarily, there is no way to impose restraints on goods after alienation, with one or two recognized exceptions that are not important here. Such claims are void because the seller parted with its whole interest in the property sold to the vendee by the sale. The basis of the decision is that where the manufacturer or jobber attempts to fix a minimum retail price, the result would be to completely foreclose the free and unrestricted competition between retailers, who are, in fact, the owners of the goods. The court said, at page 405:

"Whatever right the manufacturer may have to project his control beyond his own sales must depend, not upon an inherent power incident to production and original ownership, but upon agreement."

The court said that contracts in restraint of trade must be considered in the light of commercial needs at the time such

contract is made. On page 406 of the opinion, the following, applicable here, appears:

"* * * As was said by this court in *Gibbs* v. *Baltimore Gas Co.*, 130 U. S., p. 409, 'The decision in *Mitchel* v. *Reynolds*, 1 P. Wms., 181; *S. C.*, Smith's Leading Cases, 407, 7th Eng. ed; 8th Am. ed. 756, is the foundation of the rule in relation to the invalidity of contracts in restraint of trade; but as it was made under a condition of things and a state of society, different from those which now prevail, the rule laid down is not regarded as inflexible, and has been considerably modified. Public welfare is first considered, and if it be not involved and the restraint upon one party is not greater than protection to the other party requires, the contract may be sustained. The question is, whether, under the particular circumstances of the case and the nature of the particular contract involved in it, the contract is, or is not unreasonable. * * *.'

"* * * But there are exceptions: restraints of trade and interference with individual liberty of action may be justified by the special circumstances of a particular case. It is a sufficient justification, and indeed it is the only justification, if the restriction is reasonable—reasonable, that is, in reference to the interests of the parties concerned and reasonable in reference to the interests of the public, so framed and so guarded as to afford adequate protection to the party in whose favor it is imposed, while at the same time it is in no way injurious to the public."

This view of the law was expressed at a time when trademarks or trade names were not the labels by which the public was induced to select a manufacturer's product because of his direct advertisements and sales efforts, but at a time when the usual action concerning trade names had to do with attempts to fraudulently use the labels or trademarks of another. Mr. Justice Oliver Wendell Holmes, in a strong dissenting opinion, suggests that by the slightest change the contract could not be attacked. He states the following:

"* * * If it should make the retail dealers also agents in law as well as in name and retain the title until the goods left their hands I cannot conceive that even the present enthusiasm for regulating the prices to be charged by other people would

214

deny that the owner was acting within his rights.  It seems to me that this consideration by itself ought to give us pause.

"But I go farther.  There is no statute covering the case; there is no body of precedent that by ineluctable logic requires the conclusion to which the court has come.  The conclusion is reached by extending a certain conception of public policy to a new sphere.  On such matters we are in perilous country.  I think that, at least, it is safe to say that the most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interferences is very clear. * * *''

And on page 412, Mr. Justice Holmes said:

"'* * * I think that we greatly exaggerate the value and importance to the public of competition in the production or distribution of an article (here it is only distribution), as fixing a fair price.  What really fixes that is the competition of the conflicting desires.  * * * As soon as the price of something that we want goes above the point at which we are willing to give up other things to have that, we cease to buy it and buy something else.  * * * The Dr. Miles Medical Company knows better than we do what will enable it to do the best business.  We must assume its retail price to be reasonable, for it is so alleged and the case is here on demurrer; so I see nothing to warrant my assuming that the public will not be served best by the company being allowed to carry out its plan.  I cannot believe that in the long run the public will profit by this court permitting knaves to cut reasonable prices for some ulterior purpose of their own and thus to impair, if not to destroy, the production and sale of articles which it is assumed to be desirable that the public should be able to get.''

After the *Dr. Miles case*, no attempt seems to have been made to legislate on the question of sanctioning by law agreements coming within the oribt of statutes designated as "Fair Trade Laws" until 1931 when California passed as a part of the Business and Professions Code, Sections 16900 to 16905, inclusive.  Section 16902 is similar in context, and in purpose identical, to Section 1333.06 and Section 1333.07, Revised Code, a part of the Ohio Fair Trade Act of 1936.

These sections containing the non-signer clause have been held constitutional in a number of cases in California.  *Max*

*Factor & Co.* v. *Kunsman* (1936), 5 Cal. (2d), 446, 55 P. (2d), 177; *Scovill Mfg. Co.* v. *Skaggs Pay Less Drug Stores* (1955), 45 Cal. (2d), 881, 291 P. (2d), 936.

The *Factor case* was affirmed on appeal to the United States Supreme Court in 299 U. S., 198, 81 L. Ed., 122, 57 S. Ct., 147, in an opinion by Mr. Justice Sutherland, relying on the *Old Dearborn Case, infra.*

The Illinois Fair Trade Act of 1935 (Smith-Hurd Rev. Statutes, 121½, paragraph 188 *et seq.*), which in substance is identical with the Ohio Act of 1936, including the non-signer provision, was challenged in the case of *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp.* (1936), 299 U. S., 183, 81 L. Ed., 109, 57 S. Ct., 139, 106 A. L. R., 1476, on the ground that it constituted an unlawful delegation of legislative power and denied equal protection of the laws. Paragraphs 1, 2, and 3 of the headnotes of the Lawyer's Edition report of such case provide as follows:

''1. Property is not taken without due process, in violation of the Fourteenth Amendment, by a state statute which declares that wilfully and knowingly advertising, offering for sale, or selling any commodity at less than the price stipulated in any contract entered into between persons handling a commodity bearing the trademark, brand or name of the producer or owner and which is in fair and open competition with commodities of the same general class produced by others, for the maintenance of a fixed resale price, whether the person so advertising, offering for sale, or selling is or is not a party to such contract, is unfair competition and actionable at the suit of any person damaged thereby, there being nothing in the act to preclude a purchaser from removing the mark or brand from the commodity and then selling it at his own price.

''2. Legislative power is not unconstitutionally delegated by a statute which permits sellers of commodities bearing the trademark, brand or name of the producer or owner to contract with the purchaser for the maintenance of a fixed resale price, and provides that wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract thus entered into, whether the person so advertising, offering for sale or selling is or is not a party

thereto, shall be unfair competition and actionable at the suit of any person damaged thereby.

"3. The question whether price cutting by retail dealers in the case of commodities bearing the trademark, brand or name of the producer or owner is injurious to the general public is one as to which the legislature's determination is conclusive on the courts."

On pages 194, 195 and 196 of 299 U. S., the court said:

"We find nothing in this situation to justify the contention that there is an unlawful delegation of power to private persons to control the disposition of the property of others, such as was condemned in *Eubank* v. *Richmond,* 226 U. S., 137, 143; *Seattle Trust Co.* v. *Roberge,* 278 U. S., 116, 121, 122; and *Carter* v. *Carter Coal Co.,* 298 U. S., 238, 311. In those cases the property affected had been acquired without any pre-existing restriction in respect of its use or disposition. The imposition of the restriction *in invitum* was authorized after complete and unrestricted ownership had vested in the persons affected. Here, the restriction, already imposed with the knowledge of appellants, ran with the acquisition and conditioned it.

"Nor is Section 2 so arbitrary, unfair or wanting in reason as to result in a denial of due process. We are here dealing not with a commodity alone, but with a commodity plus the brand or trade-mark which it bears as evidence of its origin and of the quality of the commodity for which the brand or trademark stands. Appellants own the commodity; they do not own the mark or the good will that the mark symbolizes. And good will is property in a very real sense, injury to which, like injury to any other species of property, is a proper subject for legislation. Good will is a valuable contributing aid to business— sometimes the most valuable contributing asset of the producer or distributor of commodities. And distinctive trade-marks, labels and brands, are legitimate aids to the creation or enlargement of such good will. It is well settled that the proprietor of the good will 'is entitled to protection as against one who attempts to deprive him of the benefits resulting from the same, by using his labels and trade-mark without his consent and authority.' *McLean* v. *Fleming,* 96 U. S., 245, 252. 'Courts afford redress or relief upon the ground that a party has a valuable interest in the good will of his trade or business, and

in the trade-marks adopted to maintain and extend it.' *Hanover Milling Co.* v. *Metcalf*, 240 U. S., 403, 412. The ownership of the good will, we repeat, remains unchanged, notwithstanding the commodity has been parted with. Section 2 of the act does not prevent a purchaser of the commodity bearing the mark from selling the commodity alone at any price he pleases. It interferes only when he sells with the aid of the good will of the vendor; and it interferes then only to protect that good will against injury. It proceeds upon the theory that the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will, and constitutes what the statute denominates 'unfair competition.' See *Liberty Warehouse Co.* v. *Burley Tobacco Growers' Assn.*, 276 U. S., 71, 91-92, 96-97. There is nothing in the act to preclude the purchaser from removing the mark or brand from the commodity—thus separating the physical property, which he owns, from the good will, which is the property of another—and then selling the commodity at his own price, provided he can do so without utilizing the good will of the latter as an aid to that end.

"There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the good will and business of the producer and distributor of identified goods, but injurious to the general public as well. The evidence to that effect is voluminous; but it would serve no useful purpose to review the evidence or to enlarge further upon the subject. True, there is evidence, opinion and argument to the contrary; but it does not concern us to determine where the weight lies. We need say no more than that the question may be regarded as fairly open to differences of opinion."

Following that decision, the Congress of the United States passed the Miller-Tydings Act (15 U. S. Code, Section 1) which amended the Sherman Act, providing that "fair trade" contracts in interstate commerce do not constitute a violation of any provision of that act. That act was interpreted by the Supreme Court of the United States in the case of *Schwegmann Bros.* v. *Calvert Distillers Corp.*, 341 U. S., 384, 95 L. Ed., 1034, 71 S. Ct., 745, 19 A. L. R. (2d), 1119, where the court held in the syllabus:

"a) Price fixing is unlawful *per se* under the Sherman Act.

"b) The Miller-Tydings Act exempts 'contracts or agreements prescribing minimum prices for the resale' of the articles purchased, not 'contracts or agreements' respecting the practices of noncontracting competitors of the contracting retailers.

"c) The history of the Miller-Tydings Act supports the construction here given it."

A complete history of the fate of "Fair Trade" statutes and cases, beginning with the *Dr. Miles case,* is set out in an attempt to explain why non-signer provisions of "fair trade" laws were not exempted from the Sherman Act. The opinion was by Mr. Justice Douglas, with a concurring opinion by Mr. Justice Jackson in which Mr. Justice Minton concurred. Mr. Justice Frankfurter, with whom Mr. Justice Black and Mr. Justice Burton joined, wrote a strong dissenting opinion in which they said that it was the intention of Congress to include the non-signer clause of a fair trade law as exempt from the terms of the Sherman Act. On page 398, Mr. Justice Frankfurter said:

"The setting of the Miller-Tydings Amendment and its legislative history remove any lingering doubts. The depression following 1929 gave impetus to the movement for legislation which would allow the fixing of minimum resale prices. In 1931, California passed a statute allowing a manufacturer to establish resale prices binding only upon retailers who voluntarily entered into a contract with him. This proved completely ineffective, and in 1933 California amended her statute to provide that such a contract established a minimum price binding upon any person who had notice of the contract. Grether, Experience in California with Fair Trade Legislation Restricting Price Cutting, 24 Calif. L. Rev., 640, 644 (1936). This amendment was the so-called 'non-signer' clause which, in effect, allowed a manufacturer or wholesaler to fix a minimum resale price for his product. Every 'fair trade' law thereafter passed by any state contained this 'non-signer' clause. By the close of 1936, 14 states had passed such laws. In 1937, 28 more states passed them. Today, 45 out of 48 states have 'fair trade' laws. See Report of the Federal Trade Commission on Resale Price Maintenance XXVII (Dec. 13, 1945).

"A substantial obstacle remained in the path of the 'fair trade' movement. In 1911, we had decided *Dr. Miles Medical*

*Co.* v. *Park & Sons Co.,* 220 U. S., 373. There, in a suit brought against a 'non-signer,' we held that an agreement to maintain resale prices was a 'contract * * * in restraint of trade' which was contrary to the Sherman Law. To remove this block, the Miller-Tydings Amendment was enacted. It is said, however, that thereby Congress meant only to remove the bar of the Sherman Law from agreements between the manufacturer and retailer, that Congress did not mean to make valid the 'non-signer' clause which formed an integral part of each of the 42 state statutes in effect when the Amendment was passed.''

And on page 401, in the dissenting opinion, the following appears:

''Every one of the 42 state acts which the Miller-Tydings Amendment was to 'back up'—the acts on which the Miller-Tydings Amendment was to place a 'stamp of approval'—contained a 'non-signer' provision. As demonstrated by experience in California, the state acts would have been futile without the 'non-signer' clause. The court now holds that the Miller-Tydings Amendment does not cover these 'non-signer' provisions. Not only is the view of the court contrary to the words of the statute and to the legislative history.''

That case was decided May 21, 1951. Congress almost immediately (1952) passed the McGuire Act, 15 U. S. Code, Section 45. Paragraphs 2 and 3 thereof provide:

''(2). Nothing contained in this section or in any of the Antitrust Acts shall render unlawful any contracts or agreements prescribing minimum or stipulated prices, or requiring a vendee to enter into contracts or agreements prescribing minimum or stipulated prices, for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when contracts or agreements of that description are lawful as applied to intrastate transactions under any statute, law, or public policy now or hereafter in effect in any state, territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale.

''(3). Nothing contained in this section or in any of the

Antitrust Acts shall render unlawful the exercise or the enforcement of any right or right of action created by any statute, law, or public policy now or hereafter in effect in any state, territory, or the District of Columbia, which in substance provides that willfully and knowingly advertising, offering for sale, or selling any commodity at less than the price or prices prescribed in such contracts or agreements whether the person so advertising, offering for sale, or selling is or is not a party to such a contract or agreement, is unfair competition and is actionable at the suit of any person damaged thereby.''

The purpose of the McGuire Act was stated as follows:

''That it is the purpose of this Act to protect the rights of states under the United States Constitution to regulate their internal affairs and more particularly to enact statutes and laws, and to adopt policies, which authorize contracts and agreements prescribing minimum or stipulated prices for the resale of commodities and to extend the minimum or stipulated prices prescribed by such contracts and agreements to persons who are not parties thereto. It is the further purpose of this Act to permit such statutes, laws, and public policies to apply to commodities, contracts, agreements, and activities in or affecting interstate or foreign commerce.''

According to its sponsor, Representative McGuire:

''The McGuire bill is merely permissive. It says to the States, in effect, that Congress recognizes the rights of the States to enact and make effective policies respecting unfair competition. That is all the McGuire bill does and that is all it is intended to do.'' 98 Cong. Rec., 4979 (May 7, 1952).

''The primary purpose of the McGuire Act was to change, as to future cases, the result reached by the Supreme Court in Schwegmann Brothers v. Calvert Distillers Corp., 341 U. S., 384, 71 S. Ct., 745, 95 L. Ed., 1035 * * *. H. R. Rep. 1437, 82nd Congress, 2nd Session, pp. 1-2, U. S. Code.'' Congressional and Administrative News 1952, pp. 2181, 2182.

The McGuire Act was almost immediately brought before the court in an action to enjoin a supermarket operator from selling a manufacturer's trademarked product below the minimum retail sale price fixed under the Louisiana Fair Trade Act. *Schwegmann Bros. Giant Super Markets v. Eli Lilly & Co.*, 205 F. (2d), 788. This case was presented on stipulations of fact,

so that the issues of both the constitutionality of the McGuire Act and of the non-signer provisions of the Louisiana Fair Trade Act were clearly presented. The court held that both acts were not subject to the appellant's claims of unconstitutionality. The headnotes provide:

"1. Question whether distributors were to be protected under fair trade laws, as well as manufacturers or trade-mark owners, is matter addressed to legislative discretion and not subject to court review. * * *

"2. Right of property owner to fix price at which he will sell is an inherent attribute of property itself and, as such, is within protection of due process clauses of federal Constitution. * * *

"3. In enacting fair trade law, it was within legislative province to assume that economic laws would constitute sufficient restraint against capricious or arbitrary price fixing by producer. * * *

"4. Congressional power over interstate commerce is so plenary that Congress may exercise that power by permitting states to regulate phases of interstate commerce.

"5. Under Louisiana Fair Trade Law and federal statute removing ban of federal antitrust laws from price agreements made under state or territorial fair trade acts of designated type, Congress and Legislature intended that restrictions on nonsigners, when imposed as result of contract between producer and distributor, would be given effect. * * *

"6. Where state and federal statutes prohibit horizontal price fixing agreements between manufacturers, between producers, between wholesalers, between brokers, between factors, between retailers, or between persons, firms or corporations in competition with each other, making such statutes operative against nonsigners would not make terms of such statutes self-defeating or contradictory. * * *

"7. Louisiana Fair Trade Law and federal statute removing ban of federal antitrust laws from price agreements made under state or territorial fair trade acts of designated type are not violators of due process clauses of federal Constitution on grounds of lack of substantial relation to public welfare and delegation of legislative power to private individuals. * * *"

The Supreme Court of the United States refused certiorari, 346 U. S., 856.

The state of Virginia passed a fair trade act which, by subsequent amendment, contained a non-signer clause. In *Benrus Watch Co., Inc.,* v. *Kirsch,* 198 Va., 94, 92 S. E. (2d), 384, this provision was the subject of an action in which its constitutionality was challenged. The trial court came to the conclusion, along with other reasons for striking down this clause, that the non-signer provision was unconstitutional; but, upon appeal, the Supreme Court of Appeals held that the fair trade act had been repealed by implication by the passage of the "Anti-Monopoly Act of 1950." A new "fair trade act" was passed in 1958. Its provisions were immediately tested in the case of *Standard Drug Co., Inc.,* v. *General Electric Co.,* 202 Va., 367, 117 S. E. (2d), 289. The new act did not contain the so-called "coercive non-signer" provision, but in its stead incorporated a provision that the Supreme Court of Appeals designated as a "permissively contractual provision." While the facts stipulated in the pleadings show that the Standard Drug Company bought the flashbulbs directly from General Electric, there was no direct contract controlling the resale price to others. Standard, however, had direct notice before the purchase of the bulbs that General Electric was "fair trading" its flashbulbs in Virginia, and it also had notice of the required resale price under the Fair Trade Act. The headnotes of the case, reported in 117 S. E. (2d), 289, in part, provide:

"1. Where retailer contracted directly with manufacturer of trademarked flashbulbs, and, when purchase was made, retailer by expressed terms of contract agreed not to resell at less than specified minimum prices, retailer could not justly complain, in proceeding for declaratory judgment, that Fair Trade Act is unconstitutional, because retailer was not free to use and impair the goodwill of the maufacturer by selling flashbulbs at a price less than retailer agreed to maintain. * * *

"* * * *

"3. The Fair Trade Act, which does not contain a 'nonsigner' provision, does not violate the equal protection clause of the Fourteenth Amendment to the federal Constitution. * * *

"* * * *

"5. The Fair Trade Act, which does not contain a 'non-

signer' provision, does not violate constitutional provision that the legislative power shall be vested in a General Assembly, on ground that it delegates legislative power to private persons. * * *

"6. 'Goodwill' of manufacturer or producer is that intangible property right or asset created in public mind by skill, experience, dependability, and integrity of manufacturer or producer of a commodity, and trade-mark or trade name is the symbol of those qualities and constitutes an inseparable part of the 'goodwill.'

"7. The owner or proprietor of goodwill symbolized by his trade-mark is entitled to protection in his property right, and commodities bearing and identified by trademark, brand, or name of producer or distributor and in free and open competition with commodities of same general class are proper subjects of legislative classification.

"8. The Fair Trade Act does not violate provision of the Constitution that the General Assembly shall not enact any local, special, or private law granting to any private corporation, association, or individual any special or exclusive right, privilege, or immunity. * * *

"9. Title of Fair Trade Act stating that it is an act to permit any producer or distributor to prescribe minimum resale prices of a commodity bearing trade-mark, brand, or name of producer or distributor if commodity is in free and open competition with commodities of the same class does not violate section of the Constitution declaring that no law shall embrace more than one subject which shall be expressed in its title. * * * * * * *

"13. In determining the meaning of a 'contract' under the Fair Trade Act, Supreme Court of Appeals was not limited to single sentence in act defining a 'contract' but could and should look to other pertinent and explanatory parts of the act. * * *

"14. Acceptance by retailer of commodity for resale with notice attached stating its minimum retail price gives rise to a 'contract' under the Fair Trade Act, and therefore the Fair Trade Act is not in conflict with the Sherman Anti-Trust Act and void, on ground that the Fair Trade Act is in restraint of trade by authorizing price-fixing without a contract. * * * ''

That case clearly holds that the Legislature may define the

elements of an implied contract as coming about by conduct with knowledge of the facts upon which the agreement is based. No power to fix prices is to be found under the facts of that case, nor do the provisions of the act delegate such power to another. If the retailer does not care to buy the manufacturer's goods on the terms the manufacturer desires to sell them, or if upon buying goods that have been ''Fair-Traded'' and the price fixed for resale is made known to the buyer before purchase and he does not want the goods under the conditions stipulated, there is no reason which compels the buyer to enter into a contract to buy, but if he does, he must take the goods upon the terms of the offer. Such a transaction involves the law of contracts. The retailer acts voluntarily and is not otherwise compelled to deal for or take the goods, it, of course, being a part of the provisions of the act that the goods be identified by trademark or trade name and on the market in free and open competition with goods distributed by others in the same general class.

The Supreme Court of Appeals of Virginia resolved all questions of the constitutionality of the new Fair Trade Act of Virginia in favor of the validity of the statute and affirmed the trial court in its decree enjoining Standard from violating the resale price of flash bulbs fixed under the rules of the Virginia Fair Trade Act on the theory of implied contract. This is the only case of a state court of last resort that has considered the constitutionality of a statute identical in purpose to that of the new Fair Trade Act of Ohio. All the other cases cited by the parties concerned non-signer clauses, in purposes similar to that in the former Ohio Fair Trade Act.

With the foregoing background of ''fair trade'' legislation and the leading cases dealing with the legislative efforts to curb ''retail price cutting'' of trademarked or trade-named goods sold in open competition with goods of the same general class, it must be perfectly evident that not only the great majority of state legislatures but also the Congress of the United States have determined that there is need to provide reasonable controls in this field, under the police powers of the sovereign power. The reasons pro and con, either for or against, such legislation, are set out in great detail by the records of the hearings before the Judiciary Committees of both the House

and Senate of the Ohio Legislature when considering the Fair Trade Act passed effective October 22, 1959, over the veto of the Governor by overwhelming majorities in both houses (Sections 1333.27 to 1333.34, inclusive, of the Revised Code). Whether such legislation is desirable is within the sound discretion of the Legislature, about which the courts should not be concerned except to see to it that constitutional limitations are observed and, in case of doubt, such doubts should be resolved in favor of the acts of the Legislature.

Without attempting to set out in detail the arguments for or against "fair trade" laws, which now would serve no useful purpose, it might be well just to mention that those against "fair trade" legislation argue that the public is entitled to the benefit of the economies enjoyed by savings in purchasing goods at lower prices from cut-rate establishments, while, on the other hand, the proponents assert that the need to save the local small merchant, who not only sells merchandise in competition with all others but also renders service, is absolutely essential in many cases to the health and welfare of the community. It is claimed that price-cutting survives on the desire of the public to purchase known brands, this desire having been created by the manufacturer's sales efforts on the consumer level. In other words, the price-cutter capitalizes on the goodwill of the manufacturer. The claim that fixing retail prices by the manufacturer under the Fair Trade Act deprives the consumer of the benefits of competition is met by the claim that his goods must be sold in competition with other goods of the same class under Fair Trade Acts, which fact assures the public of all reasonable benefits of competition. However, as just stated, this is a question of fact for legislative determination. The Legislature, in adopting the Fair Trade Act of 1959, defined the purpose and policy of the Act in Section 1333.27, Revised Code, as follows:

"(A) Sections 1333.27 to 1333.34, inclusive, of the Revised Code are enacted in the exercise of the police powers of the state and in pursuance of the power specifically granted the General Assembly by the people in Section 2 of Article XIII, Ohio Constitution, to regulate the sale and conveyance of personal property, and the purposes of Sections 1333.27 to 1333.34, inclusive, of the Revised Code, are generally to protect and

preserve small business, to safeguard the goodwill of trademarks and trade names, to further wholesome competition, to prevent monopoly in the distribution of goods, and to promote the public welfare by securing wider distribution of commodities and an increase in the production thereof, and thereby reducing production and distribution costs, protecting and increasing gainful employment in manufacturing, wholesaling and retailing, all for the benefit of the consumer and the well-being of the citizens of the state.

"(B) It is the further purpose of Sections 1333.27 to 1333.34, inclusive, of the Revised Code, to promote the distribution in commerce in the state of identified merchandise which is in free and open competition with other articles of the same general class. Where fair, equitable, and competitive prices cannot be maintained in all appropriate stages in the distribution of such identified merchandise, the marketing of such merchandise is depressed and the quantity thereof moving in the channels of commerce in the state declines.

"(C) To remove obstructions to the marketing of identified merchandise in commerce which are occasioned by unfair selling practices, it is the policy of the state to afford distributors of identified merchandise an effective means whereby the sale of such merchandise at all appropriate stages of distribution may be consummated at prices adequate to stimulate distribution and low enough to enable distributors of such identified merchandise to compete effectively with those marketing other goods, who by size and dominance may distribute such goods through their down retail outlets or by franchise or consignment methods, and to satisfy the needs of ultimate consumers."

As was stated, the first "Fair Trade Act" was passed in Ohio in 1936 at about the time of the decision of the United States Supreme Court in the *Old Dearborn case*. The first Ohio Fair Trade Act contained the so-called "non-signer" provisions. The Act was challenged in 1956 in the case of *Union Carbide & Carbon Corp.* v. *Bargain Fair, Inc.*, 167 Ohio St., 182, which was decided January 22, 1958. It should be noted that, on page 185 of the opinion, Judge Zimmerman lists some of the states where a fair trade act, including a non-signer clause, had been upheld in its entirety and a few states where the courts

had come to the opposite conclusion. The date of the decision is mentioned because, after it was published, holding the non-signer provision unconstitutional as a delegation of legislative power, the Legislature, in the 103rd General Assembly, enacted Sections 1333.27 to 1333.34, inclusive, Revised Code, and in the process did not readopt the non-signer clause but, in its place, followed and somewhat enlarged on the provisions of the Virginia Act setting out the circumstances under which a buyer for wholesale or retail purposes would be bound to maintain "fair trade contracts" with the manufacturer from whom the goods were purchased as provided by the Act. This is accomplished by fixing fair-trade prices by contracts with other retailers, with notice of such prices to the retailer involved, and the retailer then purchasing such articles for resale on the retail market with knowledge that under the law he has impliedly contracted to maintain fair-trade prices by the purchase of goods for resale under such circumstances. The goods, of course, must bear the trademark or trade name of the manufacturer or producer and be sold in competition with other goods of the same class. These provisions of the new act were not in issue before the Supreme Court in the *Bargain Fair case*, and, therefore, that case is not in point on the issues in these cases.

The legislative purpose in passing the "Fair Trade Act" of 1959 was to override the decision of the Supreme Court in the *Bargain Fair case*. The Legislature studiously sought to pass an Act meeting every constitutional objection pronounced by the Supreme Court in *"Bargain Fair."* There is no purpose in any of the "fair trade" legislation to control prices collaterally. This is clearly shown by the true basic theory of the new acts of Virginia and Ohio. Here, whatever may be said of other fair trade acts, this legislation in Ohio (Sections 1333.27 to 1333.34, inclusive, of the Revised Code) provides the conduct that will create a contract controlling resale prices by the retailer whose conduct in the purchase of the goods comes within the terms of the statute. The Legislature has passed legislation of like character which has been upheld by the courts, such as defining the seller's rights under a conditional sales contract. That such a matter is subject to legislative control cannot be questioned since the Act was passed to prevent the in-

jurious effect of price cutting to the manufacturer's goodwill (found to be a fact by the Legislature) of his trademarked or trade-named goods sold in open competition on the market with like goods sold by others. The benefit to the retailer of trademarked goods is that created by the manufacturer's goodwill, inducing the ultimate purchaser to seek out the goods.

There can be no question that the seller of personal property, when he parts with title, parts with ownership in the goods, unless by the sales contract, either express, implied or by obligation imposed by law, the buyer agrees or assents to be bound to a particular course of conduct with respect thereto. If so, his obligation is because of a contract, not because of a limitation imposed upon the goods. The manufacturer or distributor of goods, by reason of his own efforts, may create in himself not only the property in the goods he manufactures, but, because of his special efforts as to the quality of such goods and his direct advertising of these goods, he creates in himself what is known as "goodwill" which is an attribute which he believes adds to the value of the goods. The manufacturer does not sell to the buyer any part of his goodwill upon parting with the property in the goods, except that the goods are identified by the trademark or trade name of the manufacturer, and, therefore, resale of the goods is influenced by the manufacturer's reputation and goodwill, to the retailer's benefit. In other words, the price-cutter sells with the help of the goodwill of the manufacturer, which goodwill he did not buy or help to support. If the retailer does not want this added sales inducement, all he has to do is remove identifying marks, sell the goods as his own, and the provisions of the Fair Trade Law no longer apply. Quoting from *Standard Drug Co., Inc.,* v. *General Electric Co., supra* (202 Va., 367), at page 373, the court said, in considering *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corp., supra*:

"It was held that the non-signer section was not so arbitrary, unfair or unreasonable as to constitute a denial of due process, because it dealt not with a commodity alone, but with a commodity plus its brand or trade-mark; that the vendee owns the commodity but not the goodwill that the trade-mark symbolizes; that the non-signer clause 'does not prevent a purchaser of the commodity bearing the mark from selling the commodity

alone at any price he pleases. It interferes only when he sells with the aid of the goodwill of the vendor; and it interferes then only to protect that goodwill against injury. * * * There is nothing in the act to preclude the purchaser from removing the mark or brand from the commodity—thus separating the physical property, which he owns, from the good will, which is the property of another—and then selling the commodity at his own price, provided he can do so without utilizing the good will of the latter as an aid to that end.' * * *.''

And, on page 375 of 202 Va., the court said:

''It appears that not only does the present Virginia act clearly meet the conditions required by *Old Dearborn* for constitutional validity (state and federal), but by elimination of the 'non-signer' provision and substitution of the provision that permits the voluntary contractual restriction on minimum resale price to be agreed upon by the maufacturer or distributor and retailer, it has removed the chief ground and reason relied upon by courts that have held Fair Trade Acts to be unconstitutional.''

In the case of *Scovill Mfg. Co.* v. *Skaggs Pay Less Drug Stores, supra* (45 Cal. [2d], 881), the court said on page 888:

''* * * Here the acts of private parties in entering into contracts for the sale of commodities constitute the facts in contemplation of which the Legislature acted, and upon the existence of which the provisions of the enactment were to be applicable. The private contracts are no more legislative in character than are other acts or conduct of private parties undertaken as a prerequisite to the application of a statute. The consequence that the statute has become applicable, and conduct in violation thereof has become actionable is in no way due to the exercise of any assumed legislative power on the part of the contracting parties. * * *''

See, also, *Weco Products Co.* v. *Reed Drug Co.* (1937), 225 Wis., 474, 274 N. W., 426; and *Goldsmith* v. *Mead Johnson & Co.* (1939), 176 Md., 682, 7 A. (2d), 176.

Most of the litigation in the federal courts involving state fair trade acts was concerned with conflicts created by statutes. The legislative desire to curb monopolies came into conflict with the desire to support acts dealing with fair trade and to define the rights of a manufacturer to defend against the detri-

ment suffered to its goodwill by price cutters. In no case here cited did the federal courts suggest that "non-signer" clauses constituted a delegation of legislative powers, and, in the *Old Dearborn case,* the "non-signer" clause was found not to offend state or federal constitutional provisions.

There can be no doubt that the "non-signer" provision of the first Fair Trade Act of Ohio, and now the implied-contract provision of the new Act, is the very heart of the Act and that, unless such provision can be enforced, the Act is completely useless.

From the foregoing analysis of the case law and the statutes with which they deal, and the clear purpose of the great majority of the Legislatures of the several states and the Congress of the United States to prevent "price cutting" as inimical to the common good, primarily as to the retail sale of trademarked or trade-named goods offered for sale on the open market in competition with other goods of the same class below the price designated by the owner of the goodwill of the goods identified by his trade name or trademark, the obligation of the retailer to maintain fair-trade prices being founded on contractual relations between the manufacturer or dealer and the retailer, as defined by the Fair Trade Act, we must conclude that the Act (Sections 1333.27 to 1333.34, inclusive, Revised Code) was passed within the constitutional powers of the Legislature of Ohio, and that its provisions violate no constitutional rights of the plaintiff or any others in a like situation.

The judgment of the Court of Common Pleas, therefore, is reversed and final judgment entered for the defendants.

*Judgments reversed.*

KOVACHY, P. J., concurs.

HURD, J., dissenting. On this appeal, the single question presented is whether the 1959 Fair Trade Act (Sections 1333.27 to 1333.34, inclusive, Revised Code) has the effect of nullifying the decision of the Supreme Court in *Union Carbide & Carbon Corp.* v. *Bargain Fair, Inc.,* 167 Ohio St., 182. In that case, Judge Zimmerman, at page 186, said:

"A majority of this court has reached the conclusion that

Section 1333.07, Revised Code, which prohibits those who are not parties to the stipulated-price contract from selling trademarked items at a price lower than that stipulated by the manufacturer, is unreasonable and unenforceable and constitutes an unauthorized exercise of the police power in that there is no substantial relation to the public safety, morals or general welfare. Moreover, it contravenes the 'due process' provision of the Ohio Bill of Rights by arbitrarily and monopolistically denying a seller, who has not entered into any price-fixing contract with the manufacturer, the privilege of disposing of his own property on terms of his own choosing, *and in addition delegates legislative power and discretion to private persons.*" (Emphasis supplied.)

In the case at bar, McNeill, J., sitting by assignment in this county, held in effect that the 1959 Fair Trade Act was subject to certain objections which the Supreme Court found to exist in the 1936 Fair Trade Act (Sections 1333.06 to 1333.10, Revised Code) for two reasons, namely, (1) that the Supreme Court in the *Union Carbide case* rejected the theory of the adequacy of proprietary interest as a basis for fair-trade legislation, and (2) that regardless of any other changes in the Act, the delegation of legislative power and discretion to private persons remains. These provisions were specifically interdicted by the Supreme Court in the *Union Carbide case.*

Inferentially, it should be noted that two other Common Pleas Courts have held that the 1959 Act is subject to certain of the objections found by the Ohio Supreme Court to exist in the 1936 Act.

In the case of *Helena Rubinstein, Inc.,* v. *Cincinnati Vitamin & Cosmetic Distributors Co.,* 84 Ohio Law Abs., 143, Judge Gusweiler of the Common Pleas Court of Hamilton County held the 1959 Act to be unconstitutional on all the grounds asserted by the Supreme Court in the *Union Carbide case.*

The latest decision on the subject was rendered April 14, 1961, by Judge Leach of the Common Pleas Court of Franklin County in the case of *Bulova Watch Co., Inc.,* v. *Ontario Store of Columbus, Inc.,* 86 Ohio Law Abs., 585, who held, on demurrer, in a very able opinion, that the 1959 Act is unconstitutional as a delegation of legislative power to private persons and, in that respect, comes within the prohibition of the decision of the Su-

preme Court in the *Union Carbide case*. The logic and reasoning of these opinions, as well as that of McNeill, J., in the instant case, while not in any sense binding upon this court, are, in my opinion, strongly persuasive on reason, logic and authority.

The great vice in the 1959 Act (as in the 1936 Act) is the delegation of legislative power to private persons without any proper formula, standard or control whatsoever. Thus, those who have the most to gain are granted the greatest delegation of legislative power, and private persons are permitted unlimited license to fix and set prices at will. Thus, the major effect is to permit private persons, by the delegation of legislative power, if they so determine, to increase and maintain high prices, particularly of drugs and vitamins. In the ordinary course of events, this will lead to a monopoly and make it difficult for persons of ordinary means to purchase regularly those aids to health and well-being so necessary under modern conditions. In this respect, the interests of the consuming public are totally ignored and the retailer is prevented from conducting his business as he sees fit.

Inasmuch as I am in accord with the opinion of the trial judge in the case at bar, I feel that no useful purpose would be served by a further discussion of the issues in this dissenting opinion. Therefore, I conclude that the judgment of the Common Pleas Court should be affirmed for the reasons generally set forth in the opinion of the trial judge. In so concluding, I am not unmindful of the case of *Standard Drug Co., Inc.,* v. *General Electric Co.,* 202 Va., 367, 117 S. E. (2d), 289, discussed at great length in the majority opinion. While that case may be somewhat persuasive, it must be distinguished from the instant case in certain respects. (See the opinion of Leach, J., in the *Bulova Watch Company case, supra* [86 Ohio Law Abs., 585].) Regardless of any arguments to the contrary, this court must be bound by the decision of the Ohio Supreme Court in the *Union Carbide case* which is presently the established law of this state. It is the prerogative of the members of the Supreme Court to determine what weight it shall give to decisions of courts of sister states.